# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HOPE LEWIS, individually and on behalf of the estate of CYRUS LEWIS, deceased,<br><br>             Plaintiff,<br><br>   v.<br><br>COUNTY OF NORTHUMBERLAND, et al.,<br><br>             Defendants. | CIVIL ACTION NO. 4:14-CV-02126<br><br>(MEHALCHICK, M.J.) |

## MEMORANDUM OPINION

Before the Court are motions for summary judgment filed by Defendants PrimeCare Medical, Inc. ("PrimeCare"), and three PrimeCare employees: Dr. Thomas Weber, Mikelanne Welliver, and Caitlin Henrie (collectively, the "PrimeCare Defendants"), and by Defendants Northumberland County, Roy Johnson, Brian Wheary, Jason Greak, Jennifer Lashomb, and Northumberland County Board of Prison Inspectors (collectively, the "County Defendants"). (Doc. 54; Doc. 58). Both sets of Defendants have filed Statements of Facts and Briefs in Support of their motions, and Plaintiff has filed Briefs in Opposition to the motions, along with Statements of Fact in response to those filed by the Defendants. As such, these motions are ripe for disposition.

## I.    BACKGROUND AND PROCEDURAL HISTORY

Hope Lewis ("Plaintiff"), mother of Cyrus Lewis ("Lewis") and administratrix for his estate, brought a wrongful death action on November 5, 2014. (Doc. 1). On June 15, 2016, Plaintiff filed an amended complaint, naming two sets of defendants – the County of Northumberland, Roy Johnson, Brian Wheary, Jason Greak, Jennifer Lashomb, and the Northumberland County Board of Prison Inspectors, and PrimeCare Medical, Inc., Dr. Weber,

Mikelanne Welliver, and Caitlin Henrie. (Doc. 25). In the amended complaint, Plaintiff alleges that the actions taken by the County Defendants and the PrimeCare Defendants caused Lewis to commit suicide in his cell on June 15, 2014; five days after Lewis was committed to the prison to await trial. (Doc. 25). Plaintiff alleges Fourteenth Amendment claims against the PrimeCare and County Defendants, a *Monell* claim against PrimeCare Defendants, and state law claims under Pennsylvania's Wrongful Death and Survival Acts.

Following a period of discovery, both sets of Defendants have moved for summary judgment. As those motions have been fully briefed, they are ripe for disposition.

## II. MOTION FOR SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

A federal court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 278 (3d Cir. 2000). In deciding a motion for summary judgment, the court's function is not to make credibility determinations,

weigh evidence, or draw inferences from the facts. *Anderson*, 477 U.S. at 249. Rather, the court must simply "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must go beyond the pleadings with affidavits or declarations, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. Fed. R. Civ. P. 56(c); *Celotex,* 477 U.S. at 324. The non-movant must produce evidence to show the existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 323. Furthermore, mere conclusory allegations and self-serving testimony, whether made in the complaint or a sworn statement, cannot be used to obtain or avoid summary judgment when uncorroborated and contradicted by other evidence of record. *See Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990); *see also Thomas v. Delaware State Univ.*, 626 F. App'x 384, 389 n.6 (3d Cir. 2015) (not precedential).

III. **STATEMENT OF FACTS**

The relevant facts are presented in the light most favorable to Plaintiff, the non-moving party. This matter arises out of the suicide of Cyrus Lewis on the fifth day of his incarceration at the Northumberland County Correctional Facility (hereinafter, "NCP") which suicide took place on June 15, 2014 (Doc. 55, ¶ 1; Doc. 72, ¶ 1; Doc. 60, ¶ 5; Doc. 70, ¶ 5). On June 2, 2014, Lewis was arrested by Coal Township Police after he took his wife's car without her permission and crashed it into a tree. (Doc. 55, ¶ 6; Doc. 72, ¶ 6). At the time of the crash, Lewis was

intoxicated and stated that he wanted to kill himself. (Doc. 55, ¶ 7; Doc. 72, ¶ 7). He totaled the vehicle, told the responding officer that he wanted to kill himself, and stated that he wanted to die. He also had a knife on him. (Doc. 72, ¶¶ 8-9). On June 9, 2014, Lewis was arrested by Shamokin Police in relation to charges of burglary, criminal trespass, and theft by unlawful taking. Specifically, he was intoxicated, stole a vehicle, and wrecked it. (Doc. 55, ¶ 10; Doc. 72, ¶ 10). In relation to these charges, Lewis was committed to NCP. (Doc. 55, ¶ 12; Doc. 72, ¶ 12).

A. HEALTH SERVICES AGREEMENT AND RELATIONSHIP BETWEEN NORTHUMBERLAND COUNTY AND PRIMECARE MEDICAL, INC.

At the time Lewis's suicide on June 15, 2014, Northumberland County had a Comprehensive Health Services Agreement with PrimeCare Medical, Inc., to provide comprehensive medical care including mental health services for individuals incarcerated at the prison. (Doc. 55, ¶ 3; Doc. 72, ¶ 3). The Comprehensive Health Services Agreement between Northumberland County and PrimeCare encompassed mental health, medical and related health care services to the inmate population, including the development and application of policy associated with basic mental health services to be applied to PrimeCare's provision of mental health services to the inmates at Northumberland County Prison, including Cyrus Lewis. (Doc. 60, ¶¶ 13-15). Throughout the record, testimony indicates that the care for inmates was a collaborative effort between corrections officials and the Medical Department, and that they worked as a team, "hand-in-hand." (Doc. 70, ¶¶ 12, 13, 47, 75; Doc. 60, ¶ 47, 75, 111). While the level of observation and whether an individual should be either placed on a suicide watch or downgraded from suicide watch must be done by the mental health clinician and not a correctional officer, the officers and supervisors worked with the medical department and were responsible for alerting them to behaviors or information important to determining the proper

watch level. (Doc. 60, ¶ 56; Doc. 70; ¶ 56). As of the date of Cyrus Lewis' death on June 15, 2014, the NCP, in conjunction with its medical provider, PrimeCare Medical, had in place a written suicide prevention program, first instituted on January 1, 2003.

B. EVENTS AND TREATMENT DURING LEWIS'S COMMITMENT TO THE NORTHUMBERLAND COUNTY PRISON

Upon being committed to the NCP on June 9, 2014, it was documented that Lewis had made statements to the arresting officer that were interpreted by the arresting officer as expressing suicidal ideation. For this reason, Lewis was stripped by NCP staff and placed in a security smock (Doc. 55, ¶¶ 13-15; Doc. 72, ¶¶ 13-15; Doc. 60, ¶ 9). Plaintiff further avers that in addition to stating that he wanted to die to the arresting officer, Lewis attempted suicide by wrecking a vehicle on two occasions while heavily intoxicated in the days leading up to his arrest. (Doc. 70, at ¶ 9). Consistent with Northumberland County's policy and procedure related to suicide prevention Section 11.01, Lewis was administered an initial booking observation questionnaire which included a suicide prevention screening questionnaire. This suicide prevention screening questionnaire accurately reflected that Lewis was reported by the transporting officer as a potential suicide risk and also did reflect that Lewis had a psychiatric history and that he showed signs of depression. (Doc. 72, ¶ 13; Doc. 60, ¶ 10; Doc. 70, ¶ 10).

An intake medical screening of Lewis was conducted on June 10, 2014 by Defendant Henrie, a Licensed Practical Nurse with PrimeCare. During that screening, Lewis admitted to moderate alcohol use, heroin and opiate use, use of morphine, Oxycontin, and Fentanyl. Henrie noted Lewis's comments to the arresting officer, and that he arrived in a suicide smock. (Doc. 55, ¶ 16; Doc. 72, ¶ 16; Doc. 60, ¶ 17; Doc. 70, ¶ 17). A behavioral health assessment was completed on June 10, 2014, by Mikelanne Welliver. (Doc. 55, ¶¶ 24-26; Doc. 72, ¶¶ 24-26;

5

Doc. 60, ¶ 19, 63). Although during that screening, Lewis indicated that he could "stay safe," that assessment also indicated that Lewis was previously treated for bipolar/depression, counseling, a psychiatric hospitalization in 2013, that he used alcohol and drugs and was experiencing withdrawal symptoms. (Doc. 70, ¶¶19, 61, 62). Lewis refused to consent to additional medication for detox and checks and indicated that the problem no longer exists. (Doc. 60, ¶ 20; Doc. 70, ¶ 20). Welliver initiated suicide watch status for Level II Suicide Watch, requiring 15 minute checks of Lewis. (Doc. 55, ¶¶ 24-26; Doc. 72, ¶¶ 24-26; Doc. 60, ¶ 16). Lewis was not placed in a suicide cell. (Doc. 70, ¶ 16). Although a Level II suicide watch protocol requires checks by correctional staff on staggered intervals of approximately 15 minutes, some checks were up to 30 minutes apart. (Doc. 72, ¶ 34). On June 12, 2014, Welliver downgraded Lewis from a Level II suicide watch to a Level III psychiatric observation, and reported that the meeting was conducted per the request of Lewis and that he indicated that he was feeling "fine". Welliver further documented that, "PT does not demonstrate any self-injurious behaviors or concerning behavior at this time. PT continues to detox. PT denies any suicidal ideations and/or homicidal ideations. PT was able to contract for safety" (Doc. 55; ¶ 40; Doc. 60, at ¶ 21). A Level III psychiatric observation is reserved for the inmate whose behavior warrants closer observation, and requires observation by correctional staff at staggered intervals not to exceed 30 minutes, and review by mental health staff Monday through Friday. (Doc. 55, ¶ 42). Plaintiff denies that the meeting was conducted at the request of Lewis, and further submits that the downgrade to Level III observation was done despite Welliver's knowledge of Lewis's history of mental health treatment, his suicidal actions prior to coming to the facility two days prior, his withdrawal, refusal to engage, poor support system, and irritability and depression (Doc. 70, ¶¶ 21, 23; Doc. 72, ¶ 40). Plaintiff further submits that

6

Welliver's downgrading of Lewis's observation status is evidence of her unfamiliarity with the suicide prevention policy. (Doc. 70, ¶ 52). In her notes, Welliver indicated Lewis's use of controlled substances, including heroin, but documented that in her professional opinion as of June 10, 2014, while he did present with anxiety and as emotionally unstable, he did not present as a suicide risk. (Doc. 60, ¶ 22). At Lewis's June 13, 2014 detox check, Lewis refused his opiate detox medication. (Doc. 55, ¶ 46). Plaintiff's expert, Dr. Daniel, avers that this refusal is an indicator of suicide. (Doc. 72, ¶ 46). Plaintiff submits that Lewis was not seen by anyone in the medical department following his June 13, 2014 examination through his suicide. (Doc. 70, ¶ 18).

### C. THE DAY OF LEWIS'S SUICIDE

Lewis's prison file reflects that on the date of his suicide he was not on suicide watch but rather on a mental health watch where checks were to be done two times per hour. Defendant Lashomb was the correctional officer assigned to perform cell checks on Lewis on the evening of his suicide. (Doc. 60, ¶ 115; Doc. 70, ¶ 115). The prison log for Lewis indicates that these cell checks were indeed performed consistently and in accord with the NCP policy in the time leading up to and including Lewis's suicide. (Doc. 60, ¶ 11). However, while Plaintiff admits that Lewis was on a 30 minute mental health watch, and that the prison logs indicate that the checks were performed, Plaintiff notes that the log indicates the checks were conducted at precise intervals (Doc. 59-4), while policy dictates that the checks should be staggered. Plaintiff further disputes the County Defendants' assertion that supervisors review the checks, and that they were aware prior to Lewis's suicide that correctional officers were not conducting proper checks. (Doc. 70, ¶ 80, 81). Further, two witnesses indicate that Defendant Lashomb did not actually conduct the checks on Lewis, and testified that it was not uncommon for her to

actually have other inmates conduct these checks. (Doc. 70, ¶ 11). Checks are not a function that can be delegated to inmates. (Doc. 60, ¶¶ 82, 113). Further, supervisors, including Defendant Greak, were responsible for making sure that inmates were checked by correctional staff, and did so by looking at the log sheets to make sure they were completed. (Doc. 70, ¶ 94). Greak would know what inmates, including Lewis, were on mental health level suicide watch, and which inmates were on checks, and could tell every inmate on a check, the level they were on, the reasoning behind the check, and where they were housed. He himself checked daily on the inmates. (Doc. 70, ¶¶ 95, 96). Warden Johnson would also review the check sheets to be sure they were completed and handed in. (Doc. 70, ¶ 102). Warden Johnson, in summarizing the events at issue, referenced video footage which has not been produced to Plaintiff, and is not part of the record in this case. His summary states that Lashomb had conducted a thirty minute check, consistent with NCP policy, 25 minutes prior to the time that she discovered Lewis hanging in his cell (Doc. 60, ¶ 12; Doc. 70, ¶ 12, 71). Further, Travis Michael testified that he told Defendant Lashomb that Lewis made life threatening comments in the days prior to and the day of his suicide, but that Lashomb waved him off. (Doc. 70, ¶ 117). The day of the suicide, Lewis had his blanket up for between 45 and 60 minutes before Lashomb asked other inmates to check on him. (Doc. 70, ¶ 123). Lashomb was aware that Lewis was suicidal. (Doc. 70, ¶ 126).

Importantly for this Court's review of the pending motions for summary judgment, the record is disputed as to whether Lewis was continuously monitored from the time he entered Northumberland County Prison until the time he was discovered hanging in his cell. The record includes the affidavits of Tim Smith and Travis Michael, who submit that Defendant Lashomb asked them to conduct the checks on Lewis, that Lewis had a blanket up in his cell for at least

45 minutes, and Lewis was "depressed and suicidal and said that life was not worth living." Michael also stated, in his affidavit, that Lashomb would ask inmates to check on other inmates, and then she would write the check down. (Doc. 70; ¶ 24; Doc. 70-3; Doc. 70-4). Upon discovery of Lewis in his cell, according to Travis Michael, Defendant Lashomb asked repeatedly "what do I do?" (Doc. 70, ¶ 97).

Northumberland County Prison, in conjunction with its medical provider, PrimeCare Medical, had in place a written suicide prevention program (Doc. 60, ¶ 25; Doc. 70, ¶ 25). However, Plaintiff disputes Defendants' assertion that the treatment of Lewis was consistent with that program and policy. (Doc. 70, ¶ 28). Specifically, Plaintiff disputes the County Defendants' assertion that PrimeCare completed a timely evaluation of Lewis consistent with its policy, and that the suicide prevention program was followed for the entire course of Lewis's incarceration. (Doc. 60, ¶ 28). Plaintiff submits that Lewis posed a significant suicide risk at the time he was book, and that he remained a high risk of suicide throughout his confinement, that he had had a significant prior mental health history, prior suicide attempts through his car crash, that he was never given a psychiatric evaluation despite his known history of mental illness, that his change from Level II to Level III watch was a deviation from the standard of care of patients/inmates with significant suicide risk, and that Welliver changed the watch level knowing his risk, and that as a result, from June 12, 2014 until the date of his suicide, PrimeCare did not provide Lewis with any medical or mental health care. (Doc. 70, ¶ 28).

D. EXPERT TESTIMONY[1]

The Northumberland County Defendants have submitted to the summary judgment record the analysis of Cyrus Lewis's suicide as prepared by Lindsay M. Hayes, Project Director of the National Center on Institutions and Alternatives. Mr. Hayes has opined that with the exception of the allegation that Jennifer Lashomb was not performing required checks, there is no evidence to substantiate the allegation that any Northumberland County Defendant ignored Mr. Lewis' mental health status during the period leading up to his suicide. Mr. Hayes determined that correctional staff had comprehensive suicide prevention training and were familiar with the policies in place at the NCP. (Doc. 60, ¶¶ 131-133).

---

[1] The court must consider the role of medical expert testimony in the context of § 1983 deliberate indifference claims. *Estate of Kempf v. Washington Cty.*, No. CV 15-1125, 2018 WL 4354547, at *13 (W.D. Pa. Sept. 12, 2018). In general, "[i]t is additional extrinsic proof [ (e.g., a training manual, photograph, or medical records) ], rather than an expert witness specifically, that [i]s required for [plaintiff] to survive summary judgment." *Id.; citing Pearson v. Prison Health Servs.*, 850 F.3d 526, 536 (3d Cir. 2017).

Medical expert testimony is properly considered for the purposes of summary judgment in the context of § 1983 deliberate indifference claims. *Estate of Kempf*, 2018 WL 4354547, at *14. The Third Circuit has held that in considering § 1983 deliberate indifference claims, medical expert testimony may be necessary where, as laymen, the jury would not be in a position to determine that the particular treatment or diagnosis fell below a professional standard of care." *Pearson,* 850 F.3d at 536. Because the courts presume that the medical care provided to a prisoner was adequate absent evidence to the contrary, a prisoner should be permitted to offer medical expert testimony to defeat that presumption and to show that the medical official failed to exercise professional judgment. *Id.* Therefore, the expert report of Dr. Daniel, provided by the Plaintiff, and the expert reports provided by the Defendants, to the extent they do not conflict with Dr. Daniel's report or other evidence, will be considered, in the light most favorable to plaintiff in determining whether plaintiff adduced sufficient evidence to survive summary judgment.

The PrimeCare Defendants have submitted reports by Nurse Pearson and Stephen Mechanick, M.D. Pearson opines that the PrimeCare staff provided Lewis with timely and thorough care that can in no way be suggested to be indifferent to his needs nor disregarding his condition, and further that the standard of care expected in an adult detention facility was met. Dr. Mechanick concluded that Lewis did not appear to be suicidal and did not indicate that he intended to attempt suicide as of June 12, 2014, and that Welliver reasonably and appropriately assessed Lewis's psychiatric condition to have improved, and appropriately changed the precautions to Level 3 psychiatric observation. (Doc. 55, ¶¶ 75-81). The PrimeCare Defendants also submitted the expert report of Richard Althouse, Ph.D., who opined that the PrimeCare Defendants provided Lewis care consistent with the standards and procedures set forth in the PrimeCare policy. (Doc. 55, ¶ 84). Finally, the PrimeCare Defendants also provide the expert report of Lindsay Hayes, who opines that the PrimeCare Suicide Prevention Policy is "very comprehensive and consistent with national correctional standards." (Doc. 55, ¶ 87).

Plaintiff has submitted the report of Dr. A. E. Daniel, who determined that Lewis posed a significant suicide risk at the time he was booked and remained so throughout his confinement at NCP; that placement of Lewis by NCP staff in a cell with known anchor points with bedsheets and clothing, knowing of his substantial and obvious suicide risk, amounted to deliberate indifference; that Defendant Lashomb knew he was expressing suicide ideations, did not communicate his status change, and instead asked two inmates to watch him; that Defendant Lashomb's security check was suspect because of its regularity and because of the testimony of two inmates and at least one officer regarding her conduct at work. Dr. Daniel further opined that Welliver's change of Lewis's status from Level II to Level III was not only premature but a clear deviation from the standard of care of patients/inmates with significant

suicide risk, but that Welliver, despite being fully aware of this risk, changed his level anyway. (Doc. 70, ¶ 132; Doc. 72, ¶ 75).

IV. **DISCUSSION**

A. SUBSTANTIVE DUE PROCESS CLAIM

Plaintiff has asserted a Fourteenth Amendment substantive due process claim against both sets of defendants.

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins,* 487 U.S. 42, 48 (1988). It is clearly established in this Circuit that the suicide of a pretrial detainee can support a recovery in a 42 U.S.C. § 1983 action as a Constitutional violation of the Fourteenth Amendment to the United States Constitution. *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (1991); *Plasko v. City of Pottsville*, 852 F. Supp. 1258 (E.D. Pa. 1994); *Simmons v. City of Phila.*, 947 F.2d 1042, 1067 (3d Cir. 1991). When a plaintiff seeks to hold a prison official liable for failing to prevent an inmate's suicide, whether a pre-trial detainee or a convicted prisoner, the plaintiff must show: (1) the individual had a particular vulnerability to suicide, meaning that there was strong likelihood, rather than a mere possibility, of a suicide attempt; (2) the prison official knew or should have known of that vulnerability; and (3) the official acted with reckless indifference to the individual's particular vulnerability. *Alexander v. Monroe County*, 734 Fed. Appx. 801 (2018); *Palakovic v. Wetzel*, 854 F.3d 209 (3d Cir. 2017); *Colburn*, 946 F.2d at 1023. A "strong likelihood" of suicide is so obvious that a lay person would easily recognize the necessity for preventative action. *Palakovic*, 854 F.3d 222; *quoting Colburn*, 946 F.3d at 1025. The Court must determine whether the evidentiary record in this case could support a finding by the Plaintiff

12

that Lewis had a particular vulnerability to suicide, and that the Defendants acted with deliberate indifference to his serious medical need.

### 1. Particular Vulnerability to Suicide

A serious medical need is 'one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention.' " *Estate of Kempf v. Washington Cty.*, No. CV 15-1125, 2018 WL 4354547, at *14–15 (W.D. Pa. Sept. 12, 2018); *Atkinson v. Taylor*, 316 F.3d 257, 266 (3d Cir. 2003) (citing *Monmouth Cty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) ). A particular vulnerability to suicide is just one type of serious medical need. *Palakovic*, 854 F.3d at 222; *Colburn II*, 946, F.2d at 1023. In order to overcome a motion for summary judgment, plaintiff must point to evidence that establishes that "the particular individual, not members of a demographic class to which the individual belongs, exhibits a particular vulnerability to suicide." *Estate of Kempf*, 2018 WL 4354547, at *14–15; *state of Thomas*, 194 F. Supp. 3d at 376 (*citing Wargo v. Schuylkill Cty.*, No. 3:06cv2156, 2008 WL 4922471 (M.D. Pa. Nov. 14, 2008), *aff'd*, 348 F. App'x 756 (3d Cir. 2009)). "A particular individual's vulnerability to suicide must be assessed based on the totality of the facts presented." *Palakovic*, 854 F.3d at 230.

In order to show that Lewis was particularly vulnerable to suicide, Plaintiff must provide evidence from which a reasonable jury could find there was a strong likelihood, rather than a mere possibility, that self-inflicted harm would occur. *See Colburn II*, 946 F.2d at 1024. In this case, the record contains evidence that Lewis was admitted to NCP after twice crashing a vehicle while intoxicated. Lewis made suicidal statements to the arresting officer, leading him to be placed in a suicide smock upon entry to the prison. Lewis was on a Level II or Level III watch during his entire time at NCP, which meant he was subject to either 15 or 30 minute

checks for the duration of his incarceration at NCP. He was placed in a suicide smock when he entered the prison. Lewis had a history of mental health treatment, including previous treatment for bipolar disorder and depression, counseling, and a psychiatric hospitalization in 2013, less than two years prior to his time at NCP. Lewis used alcohol and drugs, including heroin, and was in withdrawal when he was brought into NCP. Lewis refused additional medication for detox. He also presented with anxiety and emotional instability, Two days later, Lewis, still in detox, denied to PrimeCare Defendant Welliver that he had suicidal thoughts. He also refused to take his opiate detox medication.

Mood swings and drug and alcohol influence, *without more*, are insufficient to demonstrate a particular vulnerability to suicide, and statements concerning feelings of failure and remorse and discussions concerning a decedent's drug and alcohol history, *without more*, are insufficient to show that the decedent exhibited a strong likelihood, rather than a mere possibility, of suicide. *Estate of Kempf*, 2018 WL 4354547, at *15; *Woloszyn v. County of Lawrence*, 396 F.3d 314, 322-23 (3d Cir. 2005) (emphasis added). However, in this case, viewing the evidence in the record in the light most favorable to Plaintiff, there is far more than just statements of failure or remorse, or just mood swings and drug and alcohol influence. The Court finds that a reasonable jury could find in favor of Plaintiff and Defendants are not entitled to summary judgment on the issue of particular vulnerability to suicide. A jury will need to determine whether Lewis was particularly vulnerable to suicide, a serious medical and psychiatric need.

### 2. Deliberate Indifference

In conjunction with proof of a strong likelihood of self-inflicted harm, a plaintiff must show that the defendants were "aware of facts from which the inference could be drawn that a

substantial risk of serious harm existed, and that [they] drew the inference." *Tatsch-Corbin v. Feathers*, 561 F.Supp.2d 538, 544 (W.D. Pa. 2008) (quoting *Natale v. Camden Cnty. Corr. Facility*, 318 F.2d 575, 582 (3d Cir. 2003)). "A factfinder may determine the actor's knowledge through 'circumstantial evidence' or 'may conclude that [an actor] knew of a substantial risk from the very fact that the risk was obvious.'" *Tatsch-Corbin*, 561 F.Supp.2d at 544 (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)).

"Reckless or deliberate indifference to that risk" only demands "something more culpable on the part of the officials than a negligent failure to recognize the high risk of suicide." *Palakovic v. Wetzel*, 854 F.3d 209, 231 (3d Circ. 2017)(citing *Woloszyn*, 396 F.3d at 320). Deliberate indifference is a willingness to ignore a foreseeable danger or risk or conscience shocking behavior for unhurried situations. K*edra v. Schroeter*, 876 F.3d 424, 446 (3d Cir. 2017) (quoting M*orse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 910 (3d Cir. 1997); V*argas v. City of Phila.*, 783 F.3d 962, 973 (3d Cir. 2015)). The proof required is "something less than knowledge that the harm was practically certain." *Kedra*, 876 F.3d at 446 (quoting Z*iccardi v. City of Phila.*, 288 F.3d 57, 66 (3d Cir. 2002)). A detainee's "strong likelihood" of suicide "must be 'so obvious that a lay person would easily recognize the necessity for' preventative action." *Palakovic v. Wetzel*, 854 F.3d 209 (3d Cir. 2017)(*citing Colburn II*).

Whether the custodial officials "knew or should have known" can be demonstrated when the officials have "actual knowledge of an obviously serious suicide threat, a history of suicide attempts, or a psychiatric diagnosis identifying suicidal propensities." *Id.* at 1025 n.1 (citations omitted). Mood swings and drug and alcohol influence, *without more*, are insufficient to demonstrate a particular vulnerability to suicide and that the official should have been aware of it, and statements concerning feelings of failure and remorse and discussions concerning the

15

decedent's drug and alcohol history, *without more*, are insufficient to show that the decedent exhibited a strong likelihood, rather than a mere possibility, of suicide. *Estate of Kempf*, 2018 WL 4354547, at *15; *Woloszyn v. County of Lawrence*, 396 F.3d 314, 322-23 (3d Cir. 2005). "Liability may not be imposed unless 'there is something more culpable on the part of the officials than a negligent failure to recognize the high risk of suicide.' Instead, the 'strong likelihood of suicide must be so obvious that a lay person would easily recognize the necessity for preventative action.'" *Estate of Thomas*, 2016 WL 3639887, at *14 (quoting *Colburn*, 946 F.2d at 1023) (internal citations omitted).

Viewing the material facts in the record in a light most favorable to Plaintiff, the Court finds that a reasonable jury may find that both sets of defendants knew, or should have known of Lewis's particular vulnerability to suicide, and were deliberately indifferent to that vulnerability.

### a. PrimeCare Defendants

First, with regard to the PrimeCare Defendants, a reasonable jury could find that both Henrie and Welliver had actual knowledge of Defendants Lewis's particular vulnerability to suicide. In the course of their assessments of Lewis, they identified him as a suicide behavior risk. Henrie and Welliver made decisions about Lewis's watch level, first determining that he should be on a Level II suicide watch, and then on a Level III observation. They were aware that Lewis came into the prison in a suicide smock, having made suicidal statements to the arresting officer, and stating that he wanted to die. They were aware that he wrecked two vehicles while intoxicated in the days leading his arrest. They were aware of his prior mental health issues, including his hospitalization, and they knew he was in withdrawal from alcohol and drugs, and that he had a history of opiate use. Defendant Henrie observed that Lewis was

sad and depressed. Defendant Welliver noted signs of depression. Further, they were aware that he refused to take his detox medication. They knew Lewis had a diagnosis of bipolar disorder, and was anxious. Between the time Lewis was first brought to NCP, through June 12 when Welliver lowered him to Level III watch, Defendants observed him as flat, irritable and depressed. Just two days after being brought into NCP in a suicide smock, and having made suicidal threats, and still in the midst of withdrawal, yet refusing his detox medication, Lewis was stepped down to a Level III observation by Welliver, despite Welliver knowing that Level III observation meant Lewis would not be seen by any medical professional until the following Monday. Further, evidence in the record reflects that two inmates, Travis Michael and Timothy Smith, observed Lewis to be suicidal by his behavior in his cell. Even further, the record contains the expert report of Dr. A.E. Daniel, who opines that throughout his incarceration, Lewis remained a high risk of suicide.

      b.  <u>County Defendants</u>

Viewing the evidence in the record in a light most favorable to the Plaintiff, a reasonable jury could find that the County Defendants knew or should of known of Lewis's particular vulnerability to suicide, and were deliberately indifferent to the same. The County Defendants knew Lewis was under the care of mental health professionals through PrimeCare, and that he was subject to either 15 or 30 minute checks during his time at NCP. Further, the record contains evidence that two inmates were aware of Lewis's risk of suicide – both inmates Michael and Smith observed Lewis talking frantically, sweating, pacing, and looking depressed, melancholy, erratic, and sick. Even further, Dr. Daniel, Plaintiff's expert, opined that Lewis remained a high risk of suicide throughout his incarceration.

17

Moreover, viewing the evidence in the light most favorable to Plaintiff, Defendant Lashomb knew Lewis was suicidal, and failed to properly conduct checks on him on the day of his suicide. A blanket hung on the front of Lewis's cell for between 45 and 60 minutes before Lashomb acted – and when she did, the record contains evidence that she asked inmates to check on him. Further, Lashomb was told by inmates that Lewis had expressed suicidal thoughts, but she brushed them off. Despite Lewis having been downgraded from Level II to Level III observation, Lashomb knew Lewis had been on suicide watch, and the record contains evidence that, when viewed in a light most favorable to Plaintiff, Lashomb did not conduct proper checks and ignored warnings from other inmates about Lewis's vulnerability to suicide.

By their own testimony, and again, viewing the evidence in a light most favorable to Plaintiff, Defendants Johnson, Wheary, and Greak were involved in the day-to-day activities at NCP, and that included knowing which inmates were on different levels of watch, and where they were housed. Wheary was deputy warden and had direct communication with Greak and Lashomb. Johnson, Wheary, and Greak looked at the log sheets at some point after they were completed to make sure they were filled out. They knew Lewis was on a mental health suicide watch. Wheary dealt with the medical department on a daily basis and always looked to see who was on checks. Further, they were aware that prior to Lewis's suicide, two other inmates had committed suicide with a sheet attached to the window frame – the same method by which Lewis committed suicide. Despite knowing of his suicide risk, the County Defendants placed Lewis in a cell 5, instead of a suicide resistant special cell.

Viewing the material facts in the record in a light most favorable to Plaintiff, the Court finds that a reasonable jury could find in favor of Plaintiff, and Defendants are not entitled to

summary judgment on the issue of whether the Defendants were deliberately indifferent to Plaintiff's vulnerability to suicide.

### B. MONELL LIABILITY

Plaintiff has also asserted *Monell* claims against both the County Defendants and PrimeCare Defendants. A successful claim against a municipality must show that the policy or custom actually caused the constitutional violation at issue. *Estate of Thomas v. Fayette County*, 194 F.Supp.3d 358 (W.D. Pa. 2016). Simply pointing out the existence of an allegedly unlawful policy or custom is not enough to maintain a § 1983 claim. *Id.* Plaintiff must establish that the policy or custom of the municipality was the proximate cause of the injuries suffered. *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990). Proximate cause is demonstrated by a "plausible nexus" or "affirmative link" between the custom and the specific deprivation of constitutional rights at issue. *Id.* As a state contractor, PrimeCare may also be liable under *Monell*, if Plaintiff provides "evidence that there was a relevant [PrimeCare] policy or custom, and that the policy *caused* the constitutional violation they allege." *See Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 583-84 (3d Cir. 2003) (emphasis added). If the unconstitutional policy or custom does not facially violate federal law, liability will only be imposed if "the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice." *Berg v. Cnty. of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000). The deliberate indifference standard is met if the evidence shows that the municipality (1) had notice that similar rights violations had occurred on such a widespread basis that they were likely to occur again and (2) failed to act to address that risk despite the known or obvious consequences of inaction. Notice is generally established by a pattern of prior constitutional violations. *Alexander v. Monroe Cty.*, No. 3:13-CV-01758, 2016 WL 7104313, at *8

(M.D. Pa. Dec. 6, 2016), *aff'd*, 734 F. App'x 801 (3d Cir. 2018); *Peters v. Cmty. Educ. Centers, Inc.*, 2014 WL 981557, at *4 (E.D. Pa. Mar. 13, 2014). Supervisory liability requires deliberate indifference on the part of the supervisor as well. *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 216 (3d Cir. 2001). To establish municipal liability for failure to train in a prison suicide case, the plaintiff must (1) identify specific training not provided that reasonably could be expected to prevent the suicide that occurred, and (2) demonstrate that the "risk reduction associated with training is so great that failure of those responsible for the content of the training program to provide it can reasonably be attributed to a deliberate indifference to whether the detainees succeed in taking their lives." *Woloszyn*, 396 F.3d at 325 (Citing Colburn II, 946 F.2d at 1029-30).

### 1. County Defendants

Viewing the record in the light most favorable to Plaintiff, the court finds that a reasonable jury could find that the County Defendants knew that the policies and practices at the prison would lead to a constitutional harm, and then failed to act or not act on those policies, in deliberate indifference to that knowledge. Specifically, the record contains evidence that Defendant Lashomb had inmates conduct checks on other inmates, that she fostered a relaxed and unprofessional relationship with inmates, that the supervisors responsible for reviewing the check sheets only did so to make sure they were completed, and that Lashomb did not know how to respond to the discovery of Lewis in his cell. Further, despite knowing that he was on a Level II suicide watch, and then a Level III observation, the County Defendants placed Lewis in a cell with anchor points and bedsheets, despite being aware of two previous inmates who used anchor points to commit suicide by hanging. Plaintiff has put forth

these facts that create an issue of material fact on the *Monell* claim against the County Defendants, and as such, summary judgment on that claim is inappropriate.

### 2. PrimeCare

As a state contractor, for PrimeCare to be liable under *Monell*, Plaintiff "must provide evidence that there was a relevant [PrimeCare] policy or custom, and that the policy *caused* the constitutional violation they allege." *Estate of Thomas v. Fayette Cty.*, 194 F. Supp. 3d 358, 381 (W.D. Pa. 2016); *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 583–84 (3d Cir.2003). Likewise, a "failure to train" or a "failure to supervise" claim requires a showing that the inadequate training policies were the 'moving force' behind their injuries. This is at base a causation requirement. *Id.; see also Grazier*, 328 F.3d at 125; *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 216 (3d Cir.2001) (requiring, for supervisory liability, that "the underlying's violation resulted from the supervisor's failure to employ that supervisory practice or procedure.") The Court finds that, even in viewing the record in the light most favorable to Plaintiff, there is no disputed material fact which shows that PrimeCare either knew that the policies or practices at the prison would lead to a constitutional harm and then implemented (or failed to implement as the case may be) the policies with deliberate indifference to that knowledge, or (2) that these policies or practices were so obviously deficient and "so likely to result in the violation of constitutional rights, that the policymakers of the [prison] can reasonably be said to have been deliberately indifferent." *See Brown*, 269 F.3d at 215. Although the Court has determined that a reasonable jury could find that PrimeCare Defendants Henrie and Welliver acted with deliberate indifference, the Court does not find that there is any disputed material fact which should allow the *Monell* claim against PrimeCare to go forward, and as such, summary judgment on that claim will be granted.

21

C.  QUALIFIED IMMUNITY OF DEFENDANT LASHOMB

Qualified immunity provides not merely a "defense to liability," but rather "immunity from suit." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). Specifically, "[q]ualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). An official who reasonably believes his conduct to be lawful is thus protected, as qualified immunity provides "ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Kelly v. Borough of Carlisle*, 622 F.3d 248, 254 (3d Cir. 2010). The Supreme Court "repeatedly ha[s] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

Defendant Lashomb submits that there was no clearly established right violated in this case, and as such, she is entitled to qualified immunity. "A right is 'clearly established' if a reasonable actor under the circumstances would have known that his or her conduct impinged upon constitutional mandates." *Broadwater v. Fow*, 945 F. Supp. 2d 574, 585 (M.D. Pa. 2013). A right may be clearly established without "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011). Furthermore, the Third Circuit has noted that "[i]f the unlawfulness of the defendant's conduct would have been apparent to a reasonable official based on the current state of the law, it is not necessary that there be binding precedent from this circuit so advising." *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 211-12 n.4 (3d Cir. 2001). "In determining whether a right has been clearly established, the court must define the

right allegedly violated at the appropriate level of specificity." *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012); *see also al–Kidd*, 563 U.S. at 742 ("We have repeatedly told courts ... not to define clearly established law at a high level of generality. The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established.") (citations omitted). "The dispositive question is 'whether the violative nature of particular conduct is clearly established.'" *Mullenix v. Luna*, 136 U.S. 305, 308 (2015) (per curiam) (*quoting al–Kidd*, 563 U.S. at 742).

Defendant Lashomb submits that she is entitled to qualified immunity here because "the law was far from settled as of 2015 … that an at risk inmate had an absolute right to be subject to constant supervision based solely upon the statement of a fellow inmate that the at risk inmate had made remarks interpreted by the fellow inmate as expressions of self-harm." (Doc. 61, at 21). In making her argument, Lashomb relies on the 2015 decision of the United States Supreme Court, T*aylor v. Barkes*, 135 S.Ct. 2042 (2015). In *Taylor*, the Court held that there is no clearly established right to the proper implementation of adequate suicide prevention protocols, and addressed the right to be properly screened for suicide. Lashomb's reliance on *Taylor* is misplaced however, as in this case the relevant inquiry is whether Lewis had a clearly established right to be free from deliberate indifference to his risk of suicide while in custody. Plaintiff is not suing county individuals, including Lashomb, who did not know about Lewis's risk of suicide, which is what the claim was in *Taylor*. Rather, Plaintiff alleges that Lashomb knew of the risk, and was deliberately indifferent to the same. The Supreme Court has long held that prisoners have an Eighth Amendment right to treatment for their "serious medical needs." E*stelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Vulnerability

to suicide has been established as a serious medical need in this Circuit for some time. *See* *Colburn v. Upper Darby Township* (*Colburn I*), 838 F.2d 663 (3d Cir. 1988); *Colburn v. Upper Darby Township* (*Colburn II*), 946 F.2d 1017 (3d Cir. 1991); and *Woloszyn v. County of Lawrence*, 396 F.3d 314 (3d Cir. 2005). As such, for purposes of qualified immunity, precedent establishes that "particular conduct" such as that alleged against Defendant Lashomb violates clearly established law. The Court will deny Defendant Lashomb's motion for summary judgment on the basis of qualified immunity.

### D. Wrongful Death and Survival Actions

Plaintiff's remaining claims allege state law claims against the individual County Defendants under the Pennsylvania Wrongful Death Act, 42 Pa. Con. Stat. Ann. § 8301, and Survival Act, 42 Pa. Con. Stat. Ann. § 8302. Those defendants assert that they are immune from suit pursuant to Pennsylvania's Political Subdivision Tort Claims Act, 42 Pa. C.S. §8541, et seq. Further, Defendants submit they are not subject to any one of the eight exceptions to liability under the Act. Plaintiff submits that, pursuant to 42 Pa. C.S.A. S 8550, immunity does not apply to an employee if the employee's conduct "caused the injury and that such act constituted a crime, actual malice or willful misconduct." Willful misconduct is "conduct whereby the actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow, so that such desire can be implied." *Bright v. Westmoreland County*, 443 F.3d 276, 287 (3d Cir. 2006)(*citing Robbins v. Cumberland County Child and Youth Services*, 802 A.2d 1239, 1253 (2002)).

The Court recognizes that the PTSCA does abrogate official immunity for willful misconduct, per 42 Pa. Cons.Stat. Ann. § 8550. However, as Plaintiff's wrongful death and survival claims are predicated solely on a negligence theory, § 8550 has no effect on the analysis

here. Defendants are entitled to summary judgment with respect to those wrongful death and survival claims because the conduct at issue in this case does not fall into one of the eight enumerated exceptions to the PSTCA. *Ponzini v. Monroe Cty.*, No. 3:11-CV-00413, 2015 WL 5123720, at *15 (M.D. Pa. Aug. 31, 2015). As such, summary judgment will be entered in Defendants' favor on Plaintiff's wrongful death and survival claims.

E. DEFENDANT THOMAS WEBER

The parties are in agreement that there is no evidence of personal involvement in this matter by Defendant Thomas Weber (Doc. 55 at ¶ 88; Doc. 72 at ¶ 88; Doc. 71 at 9) and that he should be dismissed from the case. As such, summary judgment will be granted in his favor, and any claims against him are dismissed with prejudice.

F. PUNITIVE DAMAGES

Finally, Defendants have moved for summary judgment on Plaintiff's claim for punitive damages. Punitive damages in § 1983 cases are available when an individual defendant has acted with a "reckless or callous disregard of, or indifference to, the rights and safety of others." *Carroll v. Lancaster Cty.*, 301 F. Supp. 3d 486, 514–15 (E.D. Pa. 2018) (citations omitted). "Whether conduct rises to that level is for the jury to decide." *Id.*; *Woolfolk v. Duncan*, 872 F.Supp. 1381, 1392 (E.D. Pa. 1995). Because a reasonable jury could find that the conduct of the remaining Defendants rose to the level of "reckless," the claim for punitive damages survives, and Defendants' motion for summary judgment on the claim for punitive damages will be denied.

## V. CONCLUSION

For the reasons set forth in this Memorandum Opinion, the motions for summary judgment of the County Defendants and PrimeCare Defendants are **GRANTED IN PART** and **DENIED IN PART.**

An appropriate Order shall follow.

**Dated: September 30, 2018**                    *s/ Karoline Mehalchick*
                                                 **KAROLINE MEHALCHICK**
                                                 **United States Magistrate Judge**